IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:19-CR-65-TAV-DCP-1 |
| | ) | |
| DAMION E. KNOX, | ) | |
| | ) | |
| Defendant., | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate.

Now before the Court is Defendant Damion Knox's Motion for *Franks* Hearing [Doc. 435], filed on June 23, 2020. *See* 28 U.S.C. § 636(b). Defendant also filed a Memorandum in Support of Motion for *Franks* Hearing [Doc. 436].[1] The Government responded to Defendant's motion on July 31, 2020 [Doc. 471], and Defendant filed a Reply [Doc. 480] on August 5, 2020. The Court held a telephonic hearing on Defendant's Motion for *Franks* Hearing on August 10, 2020. Assistant United States Attorney Brent Jones appeared on behalf of the Government, while Attorney Philip Lomonaco appeared on behalf of Defendant.

Accordingly, for the reasons detailed below, after reviewing the parties' briefs and the relevant legal authorities, the Court recommends that Defendant's Motion for *Franks* Hearing [Doc. 435] be denied.

---

[1] The Court previously granted Defendant's motion for leave to file his motion for a *Franks* hearing. [Doc. 463]. However, in the Court's order directing the Government to respond, the Court noted that "the August 10, 2020 hearing will not constitute a *Franks* hearing." [Doc. 462].

# I. BACKGROUND

Defendant Damion Knox is charged [Doc. 99] in the Superseding Indictment with conspiracy to distribute and possess with intent to distribute a mixture and substance containing 400 grams or more of fentanyl and one kilogram or more of heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); distribution of a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2, with death resulting; possession with intent to distribute a mixture of 400 grams or more of fentanyl and 100 grams or more of heroin aided and abetted by one another, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 18 U.S.C. § 2; possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); possession with intent to distribute a mixture of 400 grams or more of fentanyl and one kilogram or more of heroin aided and abetted by one another, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2; and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

These charges rely upon evidence obtained during the execution of a search warrant by the Knoxville Police Department ("KPD") and Drug Enforcement Agency ("DEA") of 800 Washburn Road ("800 Washburn"), Knoxville, Tennessee; the traffic stop of Defendant and Codefendant Papa Diop and execution of federal arrest warrants in Detroit, Michigan; and the execution of a search warrant by DEA officers at 5258 Kensington Road ("5258 Kensington"), Detroit, Michigan. These events all occurred on April 22, 2019.

The execution of the search warrant at 800 Washburn was based upon probable cause that Defendant and Codefendant Shadeja Chandler were involved in a conspiracy to distribute heroin and fentanyl. Defendant and Codefendant Chandler both resided at 800 Washburn. The search of

800 Washburn uncovered three vacuum sealed bags containing approximately 500 grams of a substance believed to be a heroin/fentanyl mixture,[2] a loaded FN Five seveN handgun, small rubber bands commonly used to band together currency, a loaded Jiminez .380 caliber handgun, a Royal Sovereign brand money counter, a loaded Springfield AR style .233 pistol, a banded quantity of currency, and a bottle of inositol powder—a dietary supplement commonly used as a cutting agent for heroin. Additionally, law enforcement found several gun boxes, including a box for the FN pistol that was previously discovered, as well as a second box for a FN Five seveN 5.7mm pistol that contained an empty magazine, although that pistol was not found in the residence. *See* [Doc. 436-2].

While neither Defendant nor Codefendant Chandler was present at 800 Washburn at the time of the execution of the search warrant, Codefendant Chandler was subsequently arrested on an outstanding warrant and transported to 800 Washburn. After being advised of her Miranda rights, which she voluntarily waived, Codefendant Chandler gave a statement to KPD Officer Phil Jinks. Officer Jinks' Investigative Report of the execution of the search warrant at 800 Washburn details that:

> **CHANDLER** stated that she was in a relationship with "Fuji" [Defendant Damion Knox] and that he lived in the residence with her. She said that they shared the second bedroom on the left where the drugs were found. She denied any involvement in the conspiracy and said that she did not know that any drugs were in her residence. She agreed that she knew what "Fuji" was involved in. She said that "Fuji" was at the residence when she left that morning, but she understood that he intended to travel to Detroit with an "Uber" driver later in the day. She said that he was going to Detroit to pick up a Cadillac Escalade that he had purchased from a dealership there. She said that she did not know when he was coming back. . . .

---

[2] The Investigative Report noted that approximately 500 grams of a substance believed to be a heroin/fentanyl mixture was found in the top drawer of a plastic dresser in the master bedroom at 800 Washburn. *See* [Doc. 436-2]. However, the Affidavit details that law enforcement seized approximately 675 gross grams of suspected heroin/fentanyl from the entire residence. *See* [Doc. 436-1 at ¶ 13].

3

**CHANDLER** stated that she knew that "Fuji" often hid large amounts of money in the attic of their residence. When asked if she thought the money was still there, she stated that it was probably gone. She said that "Fuji" has "trust issues" and would probably have taken the money with him to Detroit. She said that she did not know how much money it was, but estimated that it was at least $80,000. Investigator Wilson and DEA Task Force Officers Standefer and Robbins searched the attic but were unable to locate any money. They did, however, find a clear plastic zippered comforter bag that was open and empty concealed under the insulation near the attic opening. Chandler said that she did not know what he kept the money in, but that she handed him a broom through the open attic access in the past to assist him in hiding the money.
. . .

Eventually, **CHANDLER** stated that "Fuji" was en route to 5258 Kensington Rd in East Detroit. She stated that he was in the process of buying that house from his aunt. I made contact with DEA Special Agent Scott Smith in Detroit and provided him with the information.

[*Id.* at 3–4].

As noted in the Investigative Report, Officer Jinks then contacted DEA Special Agent Scott Smith in Detroit, Michigan and provided him with the information he received from Codefendant Chandler and the background of the investigation into the drug conspiracy. Surveillance was established at 5258 Kensington at approximately 5:00 p.m., where DEA investigators observed a new Cadillac Escalade parked in the driveway of the residence. After approximately thirty minutes, investigators observed two black males exit the house, enter the Cadillac Escalade, and begin to drive away from the residence. Investigators observed that the driver of the vehicle matched the description of Defendant, and while in the parking lot of a restaurant, DEA agents executed the arrest warrants on Defendant and Codefendant Diop—the passenger of the vehicle. During the search of Defendant's person, "investigators located and seized a loaded magazine for a FN Five seveN handgun from his front pants' pocket," while a search of the vehicle "located several cellular telephones and documents, but did not locate a large sum of United States Currency or a firearm." *See* [Doc. 436-1 at ¶ 15].

4

An application for a search warrant of 5258 Kensington was prepared, including an affidavit from Special Agent Smith, which was based upon the information provided by Officer Jinks about the investigation of the drug trafficking conspiracy, the search of 800 Washburn, and the statements made by Codefendant Chandler, and the evidence found following the search incident to Defendant's arrest. With respect to Codefendant Chandler, the affidavit states:

> Continuing on April 22, 2019, investigators in Tennessee established a source-of-information (SOI) [Codefendant Chandler], someone who has knowledge of the inner workings of the drug conspiracy. The SOI has not provided information previously to DEA related to this drug conspiracy and did not provide information in hopes of judicial consideration or compensation. This SOI stated KNOX and DIOP departed Tennessee that morning, en route to Detroit, MI, in an unknown vehicle. The SOI stated KNOX would typically remove a large amount of drug related United States Currency from KNOX RESIDENCE [800 Washburn], when departing for Detroit, MI. The SOI stated KNOX did not want to leave his money in Tennessee while he was gone. The SOI stated KNOX likely departed on this date with over $80,000. The SOI stated, on this date, KNOX planned to immediately obtain a new Cadillac Escalade upon his arrival in Detroit, MI, and would then travel to the **TARGET LOCATION** [5258 Kensington], an address known to the SOI that KNOX was associated with and utilized when he traveled to Detroit. The SOI stated that while KNOX was in Detroit, MI, KNOX would obtain additional quantities of drugs, and then immediately return to Knoxville, TN. SOI was aware of the above details because KNOX told him/her directly.

[*Id.* at ¶ 14]. The warrant was then signed by United States Magistrate Judge R. Steven Whalen in the Eastern District of Michigan. DEA officers executed the search warrant for 5258 Kensington, "which resulted in the discovery of approximately 4.75 kilograms of suspected heroin/fentanyl mixture." [Doc. 436-2 at 4].

Lastly, Defendant's Memorandum in Support of Motion for *Franks* Hearing [Doc. 436] relates that in early May of 2020, Codefendant Chandler stated to Defendant in a recorded call that the affidavit in support of the search warrant for 5258 Kensington was incorrect.[3] On May 7, 2020,

---

[3] The calls between Defendant and Codefendant Chandler were recorded due to Defendant's pretrial detention at the Blount County Detention Center. Defendant notes that Codefendant Chandler's pretrial release was subsequently revoked due to her violation of the

5

Codefendant Chandler allegedly stated that she did not tell law enforcement that Defendant left with Codefendant Diop, but rather that he left with an Uber driver, as she did not mention Codefendant Diop's name to the KPD. [*Id.* at 3]. Additionally, Defendant asserts that Codefendant Chandler "stated that she did not mention or inform the police that Mr. Knox would go to Detroit to obtain large quantities of drugs that he would bring back to Knoxville," and Codefendant Chandler "said she only told the police that [Defendant] left with a large amount of money as he was going to 'see about' a new Cadillac and then he would probably be at [5258 Kensington]." [*Id.*]. Lastly, Defendant asserts that Codefendant Chandler stated that she did not mention to law enforcement that Defendant informed her directly of this information. [*Id.*].[4]

## II.      POSITIONS OF THE PARTIES

Defendant now moves [Doc. 435] this Court for a *Franks* hearing, challenging the validity of the search warrant for 5258 Kensington. Defendant asserts that the subsequent recorded conversations between Defendant and Codefendant Chandler, along with Officer Jinks' Investigative Report, provide a substantial preliminary showing that Special Agent Smith's statements in Paragraphs 14–16 of his affidavit (hereafter referred to as "the Affidavit") are deliberately false. Defendant submits that Codefendant Chandler is the source of information referenced in the Affidavit. Additionally, Defendant claims that the information in Paragraph 14 of the Affidavit is deliberately false, as: 1) Codefendant Chandler stated that she told law enforcement that Defendant left Knoxville with an Uber driver—not Codefendant Diop; 2)

imposed condition prohibiting her from communicating with another codefendant. *See* [Doc. 436 at 3].

[4] Defendant claims that the Government is also in possession of Codefendant Chandler's recorded statements, including the three pertinent calls on May 1, 2020, May 3, 2020, and May 7, 2020. However, the Government did not dispute Defendant's characterization of Codefendant Chandler's statements on these recorded jail calls.

6

Codefendant Chandler denies stating that Defendant would typically go to Detroit to obtain large quantities of drugs and then immediately return to Knoxville; and 3) Codefendant Chandler stated that she did not tell law enforcement that Defendant informed her of this information himself. Moreover, Defendant asserts that Officer Jinks' Investigative Report details that Codefendant Chandler stated that she understood that Defendant intended to travel to Detroit with an Uber driver, as well as that the Investigative Report did not mention Codefendant Chandler's alleged statements about Defendant traveling to Detroit to obtain drugs.

Therefore, Defendant asserts that "[b]ased on these facts that the Affidavit contained deliberate and knowingly false statements, Mr. Knox has met the burden of a preliminary showing that specified portions of the affiant's averments are deliberately false." [Doc. 436 at 7]. Next, Defendant claims that "[w]ithout these deliberate falsehoods included in the Affidavit there would not be a finding of probable cause to obtain a valid search warrant to search the [r]esidence" at 5258 Kensington. [*Id.*]. Defendant asserts that there was no information in the Affidavit without the allegedly false statements "that would provide probable cause that the evidence of the alleged drug operation would have been found there." [*Id.* at 9].

The Government responds [Doc. 471] first that Special Agent Smith did not knowingly and intentionally, or with reckless disregard for the truth, include a false statement in the Affidavit. The Government maintains that "[a]lthough the affidavit contradicts the investigative report concerning Ms. Chandler's original statements," the information in the Affidavit could be established by Special Agent Smith's own knowledge based upon Codefendant Chandler's statements that she knew "what [Knox] was into." [*Id.* at 5]. Therefore, the Government claims that based upon the investigation, "the probable explanation was that [Defendant] was going to pick up drugs as he had before," as well as that because Codefendant Diop was "an individual

7

known by law enforcement to act as an Uber driver for Defendant," Special Agent Smith could "likely conclude that Diop and Knox left Knoxville together." [*Id.*].

Additionally, the Government claims that even without the allegedly false statements in the Affidavit, it still established sufficient probable cause for the search of 5258 Kensington. The Government asserts that the Affidavit details that a magazine and an empty box for a FN Five seveN handgun were found at 800 Washburn, although the firearm was not found at the time of the search, as well as despite the fact that Codefendant Chandler stated that Defendant had likely brought over $80,000 with him to Detroit, the money was not found at 800 Washburn or in the search of the Cadillac Escalade after Defendant's arrest. Further, the Government maintains that other information Codefendant Chandler conveyed to Officer Jinks was demonstrated as correct, Defendant was under indictment for drug trafficking, and thus "the agents were able to conclude that the $80,000 and FN Five seve[N] handgun were likely in Detroit." [*Id.* at 6].

Defendant replies [Doc. 480] that the Government concedes that Codefendant Chandler is the source of information referenced in the Affidavit, and does not dispute that she made the recorded statements to Defendant. Defendant also claims that there is "no reasonable interpretation of [the challenged] statements [which] would have one conclude that the information is based upon the Affiant's own, personal knowledge of the investigation outside [of] the SOI's information." [*Id.* at 2].

With respect to the probable cause finding, Defendant alleges that without the challenged statements, the Affidavit does not provide a nexus between Defendant's criminal activity and the target residence at 5258 Kensington. Defendant asserts that nothing in the Affidavit details that he used the residence at 5258 Kensington to store money or other criminal activity, and that the $80,000 at issue was intended to be used to obtain the new Cadillac. Lastly, Defendant claims that

the Affidavit's inclusion of Codefendant Chandler's statements that he was en route to Detroit and would go to the residence at 5258 Kensington is not sufficient without an indication of criminal activity.

## III.     LEGAL STANDARD

Under the Fourth Amendment, there must be probable cause for a search warrant to issue, and the warrant must be based on facts that demonstrate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When determining whether an affidavit establishes probable cause, the Court typically considers only the information that was before the issuing judge, ie., only what is contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010); *see also Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971).

"In a *Franks* hearing, a court determines whether to suppress the fruits of an executed search warrant, where the warrant was the result of a false statement." *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). "A defendant challenging the validity of a search warrant's affidavit bears a heavy burden." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). "[O]f course, a presumption of validity [exists] with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171. To be entitled to a *Franks* hearing, "a defendant must make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included

9

by the affiant in the warrant affidavit.'" *Crawford*, 943 F.3d at 309 (quoting *Franks*, 438 U.S. at 171). "'The allegedly false statement,' moreover, must be 'necessary to the finding of probable cause.'" *Id.*

In *Crawford,* the Sixth Circuit detailed the "two questions of fact, and one of law," upon which "[a] *Franks* analysis turns:"

> The two questions of fact: One, is there a false statement included in an affidavit? If so, then two, how culpable is the affiant officer in including that statement in the affidavit? Where the affidavit does include a false statement, and where the officer making the statement was culpable in doing so, then the court turns to a question of law: After excising the false statement, is there sufficient information in the affidavit to constitute probable cause to issue a warrant?

*Id.*

The Sixth Circuit has also extensively detailed the necessary culpability of an affiant required to warrant a *Franks* hearing, stating:

> The bottom line [in *Franks* was] that an evidentiary hearing on the affidavit's truthfulness was required *only* if the defendant alleged "deliberate falsehood or . . . reckless disregard for the truth." [*Franks*, 438 U.S. at 171]. "Allegations of negligence or innocent mistake," the Court emphasized, would be "insufficient." *Id.* And the allegations of deliberate or reckless falsehood "must be accompanied by an offer of proof." *Id.* Even having satisfied these steps, a defendant must still show that "when material that is the subject of the alleged falsity or reckless disregard is set to one side," the affidavit's remainder no longer demonstrates probable cause. *Id.* at 171–72. Only then is a defendant entitled to a *Franks* hearing to prove his allegations. *Id.* at 172. *Franks* thus drew an evidentiary line with reference to the well-known common-law scienter standards: negligence, recklessness, and willfulness. *See* Restatement (Second) of Torts §§ 8A, 282, 500 (1965). Only "substantial" evidence tending to show one of the two more culpable mental states, *Franks* said, would do.

*Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019). An officer's statement is only considered to be issued with "reckless disregard for the truth" if the defendant shows the affiant subjectively entertained "serious doubts as to the truth" of his allegations. *United States v.*

*Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). "Allegations of [an officer's] negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171.

## IV.    ANALYSIS

### A.    False Statements and Culpability of Affiant

To demonstrate entitlement to a *Franks* hearing, Defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false." *Franks*, 438 U.S. at 170; *see United States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014) ("[T]his court's well-settled framework for *Franks* hearings requires a defendant to 'point to specific false statements.'") (quoting *United States v. Cummins*, 912 F.2d 98, 103 (6th Cir. 1990)).

During the hearing, Defendant identified the allegedly false statements in the Affidavit: 1) that the SOI [Codefendant Chandler] "stated that KNOX and DIOP departed Tennessee that morning, en route to Detroit, MI;" 2) that Codefendant Chandler stated that Defendant "would typically remove a large amount of drug related United States Currency from KNOX RESIDENCE, when departing for Detroit;" and 3) that Codefendant Chandler stated that "while Knox was in Detroit, MI, [Defendant] would obtain additional quantities of drugs, and then immediately return to Knoxville." *See* [Doc. 436-1 at ¶ 14]. Additionally, in his briefing before the Court, Defendant also includes Codefendant Chandler's alleged statement that she "was aware of the above details because KNOX told him/her directly." [*Id.*]; *see* [Doc. 436 at 3, 6]. The Government also conceded that statements included in the Affidavit were not included in the Investigative Report.

Here, the Government has not challenged Defendant's characterization of Codefendant Chandler's statements on the recorded jail calls. Further, Defendant has identified the allegedly false statements detailed in the Affidavit attributed to Codefendant Chandler that are in conflict

with Codefendant Chandler's subsequent recorded conversations with Defendant. Therefore, the Court finds that Defendant has met his burden to make a substantial showing that the warrant affiant made false statements sufficient to warrant a *Franks* hearing.

As detailed above, Defendant must also establish that Special Agent Smith, as the warrant affiant, "knowingly and intentionally or with reckless disregard for the truth" included these false statements in the Affidavit. *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019) (quoting *Franks*, 438 U.S. at 171). Here, the Court notes that "the *Franks* analysis applies not only to the affiant but must extend also to government and police officers who furnish erroneous information to the affiant as well." *United States v. Neal*, No. 3:11-CR-69, 2012 WL 2154271, at *8 (E.D. Tenn. June 12, 2012) (quoting *United States v. Delgado,* 121 F. Supp. 2d 631, 641 (E.D. Mich. 2000)), *aff'd*, 577 F. App'x 434 (6th Cir. 2014). "However, the burden remains with the defendants to show by a preponderance of the evidence that said non-affiant officers acted with intentional, knowing, or reckless (i.e. 'serious doubts . . . or obvious reason to doubt the accuracy of the information') disregard for the truth." *Id.* (quoting *Peet v. City of Detroit,* 502 F.3d 557, 571 n.3 (6th Cir. 2007)).

Ultimately, as the Affidavit, even without the challenged false statements at issue, is sufficient to support a finding of probable cause, the Court will not address at this time whether Defendant has made the required showing that the alleged false statements were included by Special Agent Smith or Officer Jinks with sufficient culpability. *See Franks v. Delaware*, 438 U.S. 154, 171–72 (1978) ("[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."); *see also United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019).

12

### B. Probable Cause Finding

The Government maintains that even if the challenged statements were considered factually untrue and were included with sufficient culpability, these statements are not necessary to establish probable cause to search 5258 Kensington. The Government argues that the Affidavit establishes sufficient probable cause, as it details the indictment for drug trafficking conspiracy charges, that 5258 Kensington was an address that Defendant utilized when he traveled to Detroit, that Defendant left Knoxville with over $80,000 which was not found after the search incident to his arrest, and that a loaded FN Five seveN magazine was found in Defendant's pocket after his arrest. Therefore, the Government claims that there was sufficient probable cause to search 5258 Kensington for the firearms at issue and the large sum of money, as well as other evidence of drug-related activity.

Defendant claims, however, that without these statements, there is not probable cause of drug-related activity at 5258 Kensington. Defendant asserts that without the challenged statements, the Affidavit merely details that he was traveling from Knoxville to Detroit with $80,000 to purchase an Escalade, that he was involved in a drug trafficking organization, and that he was seen leaving 5258 Kensington. Additionally, Defendant claims that "there is nothing indicating that [he] utilizes the Residence [at 5258 Kensington] to store his money or for other criminal activity." [Doc. 480 at 4].

Probable cause consists of "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). To determine probable cause, an issuing judge must examine the totality of the circumstances and find "a fair probability that contraband or evidence of a crime will be found in a particular place." *United*

13

*States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (internal quotation marks omitted). For a search warrant to issue, an affidavit must show a likelihood that (1) the items sought are seizable by virtue of being connected with criminal activity and (2) the items will be found in the place to be searched. *United States v. O'Connor*, 723 F. App'x 302, 307 (6th Cir. 2018) (internal citations omitted). A supporting affidavit must, therefore, sufficiently demonstrate the existence of a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)).

In determining whether an affidavit establishes a nexus, the undersigned begins by observing that the issuing judge's determination that probable cause exists is entitled to "great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). The "nexus [between the place to be searched and the evidence sought] may be established by the nature of the items and normal inferences of where a person would keep such items." *United States v. Hawkins*, 278 F. App'x 629, 634 (6th Cir. 2008). The Sixth Circuit has held that "an issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking," *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008), but that "a defendant's status as a drug dealer, standing alone" will not "give[ ] rise to a fair probability that drugs will be found in his home." *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005). "Therefore, to meet the probable cause standard, an affidavit must include some facts connecting the residence to drug-dealing activity beyond just the defendant's status as a drug dealer." *United States v. Jenkins*, 743 F. App'x 636, 642 (6th Cir.), *cert. denied*, 139 S. Ct. 611 (2018).

14

In *United States v. Brown*, the Sixth Circuit detailed that "as a general matter, that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." 828 F.3d 375, 382–84 (6th Cir. 2016). The Sixth Circuit explained that in order to infer that drugs could be located at the defendant's residence, his "status as a drug dealer" plus "some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence" is required to find a sufficient nexus for probable cause purposes. *Id.* at 383. Specifically, the *Brown* Court explained that "we have required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." *Id.* Defendant claims that without the purportedly false statements in the Affidavit, there are not sufficient facts to directly connect 5258 Kensington with his suspected drug dealing.

Here, facts weighing against a finding of probable cause include that 5258 Kensington was not Defendant's primary residence; rather, the Affidavit details that it was "an address known to [Codefendant Chandler] that [Defendant] was associated with and utilized when he traveled to Detroit." [Doc. 436-1 at ¶ 14].[5] While it was known that Defendant was involved as a leader of a drug trafficking organization, "a suspect's status as a drug dealer, standing alone," [does not] give [ ] rise to a fair probability that drugs will be found in his home." *Brown*, 828 F.3d at 383 (quoting *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005)). Defendant asserts that "[n]one of the remaining information in the Affidavit includes any reference to or notion that drugs or guns will be found in the residence in Detroit. [Doc. 436 at 8–9]. Furthermore, Codefendant Chandler's

---

[5] However, Defendant also asserts that "[t]his current case is analogous to *U.S. v. Brown*," a case involving the defendant's primary residence, to claim that the Affidavit does not provide a nexus between his alleged criminal activity and 5258 Kensington. [Doc. 436 at 8].

15

statement that Defendant would obtain additional quantities of drugs in Detroit is excluded from the Court's probable cause analysis. Lastly, although Defendant was observed leaving 5258 Kensington on April 22, 2019, "'a suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish that relationship' necessary to a finding of probable cause." *United States v. Savoca,* 761 F.2d 292, 297 (6th Cir. 1985) (quoting *United States v. Flores,* 679 F.2d 173, 175 (9th Cir. 1982)).

However, "[t]he critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). In contrast to *Brown*, "[c]ritically, the warrant's validity does not hinge on the affidavit providing probable cause to believe that drugs would be found" at 5258 Kensington. *See United States v. Nantz*, --- F. Supp. 3d ---, 2020 WL 3100021, at *6 (E.D. Ky. June 11, 2020) ("That was *Brown*'s focus, and the central concern of the parties' briefing . . . The probability of drug-discovery is only one option for satisfying a broader predicate[.]"). Rather, the Affidavit states that "[b]ased on the fact that money was not found in the Cadillac when Knox and Diop were arrested, investigators believe probable cause exists to search [5258 Kensington] for currency, firearms, or any other indicia of the TARGET OFFENSES." [Doc. 436-1 at ¶ 16].

Unlike in *Brown*, the warrant for 5258 Kensington did not seek to "infer[ ] that drugs will be found in the defendant's home—[because] the defendant is a known drug dealer." 828 F.3d at 382. "In *Brown*, the defendant was apprehended leaving the location of a sale of more than 500 grams of heroin, and was found to be in possession of $4,813 in currency." *See Peffer v. Stephens*, 880 F.3d 256, 270 (6th Cir.) (citing *Brown*, 828 F.3d at 378–80), *cert. denied*, 139 S. Ct. 108 (2018). The Sixth Circuit found that despite this arrest, the magistrate judge was not entitled to

16

infer that evidence of drug trafficking would subsequently be found at the defendant's residence. *Brown*, 828 F.3d at 378–80. Here, during the search of Defendant's residence at 800 Washburn, KPD officers located substantial evidence of drug trafficking, including drugs, currency, loaded firearms and a second box for a FN Five seveN 5.7mm pistol that contained an empty magazine, although that pistol was not found in the residence. *See* [Doc. 436-2]. In addition, Codefendant Chandler had advised officers that Defendant was on his way to Detroit, specifically to 5258 Kensington, carrying $80,000 in cash that he did not want to leave behind in Tennessee [Doc. 436-1 at ¶ 14]—the same cash that had been stored at 800 Washburn earlier the same day just before the execution of the search warrant. She further advised that Defendant planned to obtain a new Cadillac Escalade in Detroit. Through surveillance, Defendant was observed leaving 5258 Kensington in a Cadillac Escalade, and he was subsequently arrested along with Codefendant Diop. During the search of Defendant pursuant to his arrest in Detroit, law enforcement seized a loaded magazine for a FN Five seveN handgun from his front pants' pocket. [Doc. 436-1 at ¶ 15].

The Sixth Circuit has acknowledged the "struggle[ ] to identify the quantum of evidence needed to connect drug trafficking by an individual to a probability that the evidence will be found at the individual's residence." *United States v. Ardd*, 911 F.3d 348, 351 (6th Cir.), *cert. denied*, 139 S. Ct. 1611 (2019). However, "*Brown* notwithstanding, the core analysis remains unchanged"—the issuing judge is tasked with making a practical, common-sense determination of whether the affidavit sets forth a nexus establishing a fair probability that contraband or evidence of a crime will be found in a particular place. *Nantz*, 2020 WL 3100021, at *4 (citing *United States v. Penney*, 576 F.3d 297, 311 (6th Cir. 2009) (cleaned up));[6] *see, e.g.*, *Illinois v. Gates*, 462 U.S. 213, 238 (1983). At this stage, law enforcement had found both a loaded and empty magazine for

---

[6] *See United States v. Joiner*, 727 F. App'x 821, 827 (6th Cir. 2018) (using "cleaned up" parenthetical to remove internal quotations and alterations to the language of the cited opinion).

17

the FN Five seveN handgun at Defendant's primary residence and on his person, on the same day, without finding the firearm. Further, at Defendant's primary residence, officers had discovered numerous items indicating his involvement in drug trafficking: three vacuum sealed bags containing approximately 675 grams of a substance believed to be a heroin/fentanyl mixture, small rubber bands commonly used to band together currency, a money counter, a bottle of inositol powder used as a cutting agent for heroin, a banded quantity of currency, and several loaded firearms. *See e.g.*, *United States v. Wheaton*, 517 F.3d 350, 364 (6th Cir. 2008) ("This court has made clear that firearms, as tools of the drug-trafficking trade, are probative evidence in drug prosecutions."); *United States v. Paulino,* 935 F.2d 739, 754 (6th Cir. 1991) ("This court has on several occasions recognized that firearms and ammunition are tools of the drug trafficking trade and have been admitted in drug distribution cases as tools of the drug conspiracy."), *superseded by statute on other grounds*, U.S.S.G. § 3B1.1; *United States v. Dunford*, No. 2:19-CR-038-JRG-DHI, 2019 WL 5431614, at *5 (E.D. Tenn. Oct. 23, 2019) ("Several courts, including the Sixth Circuit, have held that probable cause exists to search a suspect's residence for a firearm based on little more than an inference that the residence is the most likely place for the firearm.") (collecting cases).

In addition, Codefendant Chandler had advised that Defendant was traveling with $80,000 in cash, previously stored at 800 Washburn, and heading to Detroit, specifically to 5258 Kensington, which provided further evidence of a connection with drug trafficking. *See, e.g., United States v. $67,220,* 957 F.2d 280, 285 (6th Cir. 1992) ("[C]arrying a large sum of cash is strong evidence of some relationship with illegal drugs."); *United States v. Remble*, No. 1:05-CR-113-001, 2006 WL 462451, at *3 (S.D. Ohio Feb. 22, 2006), *aff'd sub nom.*, *United States v.*

*Anderson*, 333 F. App'x 17 (6th Cir. 2009) ("The large sums of cash is evidence of a connection with drug trafficking.").

"The requirement that there be additional reason to think that evidence of the crime will be found in the criminal's residence is not as onerous as it may appear." *See Peffer v. Stephens*, 880 F.3d 256, 270 (6th Cir.), *cert. denied*, 139 S. Ct. 108 (2018). "A magistrate may infer a nexus between a suspect and his residence, depending upon 'the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places.'" *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008) (quoting *United States v. Savoca,* 761 F.2d 292, 298 (6th Cir. 1985)). Here, setting aside the challenged statements, the Affidavit establishes that Defendant left Knoxville traveling to Detroit with $80,000 in cash, which he had kept at 800 Washburn; during the search of 800 Washburn, officers seized numerous items indicating a connection with drug trafficking; the residence at 5258 Kensington was closely associated with Defendant as an address that Defendant frequented when traveling to Detroit based on information provided by Codefendant Chandler that was corroborated by surveillance; Defendant was observed leaving 5258 Kensington shortly before his arrest; and during the search incident to Defendant's arrest, a loaded FN Five seveN magazine was seized from Defendant's pants' pocket. Additionally, the Affidavit does not just establish that Defendant is a drug dealer, but details that Defendant is alleged to be the leader of a major drug trafficking organization.[7] The Affidavit demonstrated a

---

[7] The Sixth Circuit in *Brown* noted that "in a few cases, we found the nexus sufficient even though the affidavit did not contain facts showing that the residence had been used in drug trafficking," but that "[t]hese cases are distinct from the typical drug trafficking case" because the affidavits "contained overwhelming evidence that the defendants were major players in a large, ongoing drug trafficking operation." *United States v. Brown*, 828 F.3d 375, 383 n.2 (6th Cir. 2016) (citing *United States v. Gunter*, 551 F.3d 472, 476–77 (6th Cir. 2009); *United States v. Kenny*, 505 F.3d 458, 461–62 (6th Cir. 2007); *United States v. Miggins*, 302 F.3d 384, 388 (6th Cir. 2002)).

continuing sequence of events evidencing a connection with illegal drug activity, from which it could be reasonably inferred that items related to such activity, i.e., the large sum of currency and a handgun, would be found at 5258 Kensington, Defendant's known target destination while in Detroit. All of these events transpired within a matter of hours, leaving little opportunity for Defendant to conceal the evidence elsewhere.

In *Peffer*, the Sixth Circuit differentiated guns and computers from drugs, as "unlike guns and computers that are used in the commission of a crime, when drugs are used in the commission of a distribution offense, the distributed drugs are no longer in the possession of the suspected distributor." 880 F.3d at 273. "The affidavit therefore must establish some other reason to believe that drugs or other evidence of crime would be found in the suspect's residence if searched." *Id.* Specifically, the Sixth Circuit noted how the "principle" set forth in *Brown* and the nature of drugs "also explains why we are more reticent to find a nexus between **drugs** and their distributor's residence." *Id.* at 272 (emphasis added). Here, while 5258 Kensington was not Defendant's primary residence, the described connection and Defendant's recent presence at this address, coupled with the progression of events throughout the day—discovery of an empty FN Five seveN handgun box and magazine during the search at 800 Washburn where overwhelming evidence of drug trafficking was uncovered, Defendant traveling directly to Detroit with a large sum of cash that had been stored at 800 Washburn, and Defendant being found later the same day with a loaded magazine for the same type of FN Five seveN handgun—allows the reasonable inference that such a firearm would be found at 5258 Kensington. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."). The Affidavit also notes that, based

upon Special Agent Smith's knowledge and experience, "drug traffickers possess firearms, ammunition, and other dangerous weapons in their residence, business, automobiles, and on their person to protect their drug related currency and assets," as well as that "[t]ypically, drug traffickers maintain possession of firearms for extended periods of time." [Doc. 436-1 at ¶ 7(e)].

Next, although Defendant claims that the Affidavit also details that he was traveling to Detroit to purchase a new Cadillac Escalade, and that he was ultimately arrested while driving a new Escalade, the Court finds that the Affidavit establishes "a fair probability that evidence of a crime," i.e., large amounts of cash, would be found at 5258 Kensington. *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). Here, in addition to Defendant's status as the alleged leader of the drug trafficking organization, the Affidavit details that "[d]rug traffickers often must maintain on hand, large amounts of U.S. Currency in order to maintain and finance their on-going narcotics business" [Doc. 436-1 at ¶ 8(c)], Defendant departed Knoxville on April 22, 2019 with over $80,000 [*Id.* at ¶ 14], and that Defendant did not "want to leave his money in Tennessee while he was gone" [*Id.*].[8] Lastly, the Affidavit provides that a "large sum of United States Currency" was not found on Defendant's person or in the Cadillac Escalade following the search conducted incident to Defendant's arrest. [*Id.* at ¶ 15]. The Affidavit specifically cites the "SOI information that KNOX would travel with his money" [*Id.* at ¶ 16], which remains a valid support of probable cause due to Codefendant Chandler's unchallenged statement that Defendant did not like to leave his money in Knoxville while he traveled.

---

[8] Additionally, the Investigative Report details that Codefendant Chandler states that Defendant had "trust issues" and "would probably have taken the money with him to Detroit," as well as that Defendant was traveling to Detroit "to pick up a Cadillac Escalade that he had purchased from a dealership there"—contrary to Defendant's assertions. [Doc. 436-2 at 3].

21

Additionally, the warrant to search 5258 Kensington was not solely based on Defendant and Codefendant Diop's presence at this location shortly before their arrest. In *United States v. Savoca*, the Sixth Circuit found that the fact that two individuals known to be involved in illegal activity were observed at the same location did not provide probable cause or establish a nexus that evidence of the bank robberies allegedly committed at an unspecified date would be found in a motel room. 761 F.2d 292, 297 (6th Cir. 1985). While ruling on the Government's petition for rehearing, the Sixth Circuit noted that the affidavit did not establish sufficient probable cause when it failed to "state when the robberies occurred and because the robberies occurred over halfway across the country," as well as that the affidavit "failed to describe the relationship of the persons to the premises." *Id.* at 298.

Here, the Court finds that the remaining facts in the Affidavit would allow the magistrate judge to infer that evidence of wrongdoing would be found at 5258 Kensington—chiefly a large amount of cash and a FN Five seveN firearm. Unlike in *Savoca*, the Affidavit described Defendant's relationship to 5258 Kensington as Defendant's known destination that he utilized when traveling to Detroit, and further, it detailed the unfolding of events related to recent evidence of criminal wrongdoing. As the Court previously detailed, the Affidavit—even with the challenged statements excluded—describes Defendant's arrest warrant and indictment for drug trafficking conspiracy charges, Defendant's alleged role as the leader of the drug trafficking organization, the evidence obtained during the search of 800 Washburn, that Defendant took $80,000 from the Washburn residence and departed Knoxville traveling to Detroit, that Defendant had previously utilized 5258 Kensington when he traveled to Detroit, that he was seen leaving this address immediately prior to his arrest, that a loaded FN Five seveN magazine was found in

22

Defendant's pocket after his arrest, and that neither large amounts of U.S. currency nor the FN Five seveN handgun was found during this search.

Ultimately, "the affidavit must suggest that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought and not merely that the owner of property is suspected of crime." *Peffer v. Stephens*, 880 F.3d 256, 270 (6th Cir.), *cert. denied*, (2018) (quoting *McPhearson*, 469 F.3d at 524). Probable cause "requires only a probability or substantial chance of criminal activity." *United States v. Tagg*, 886 F.3d 579, 585–86 (6th Cir. 2018) (quoting *District of Columbia v. Wesby*, --- U.S. ---. 138 S. Ct. 577, 586 (2018)). "This is not a high bar for the government to satisfy." *United States v. Bateman*, 945 F.3d 997, 1010 (6th Cir. 2019). Therefore, for the reasons detailed above, the Court finds that even without the challenged statements, the Affidavit is sufficient to support a finding of probable cause, such that a *Franks* hearing is not necessary. *See Franks v. Delaware*, 438 U.S. 154, 171–72 (1978) ("[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."); *United States v. Crawford*, 943 F.3d 297, 309–10 (6th Cir. 2019) ("After all, even if the statements at issue were false, and even if Boyd had some culpability in including them in his affidavit, the affidavit contained an ample amount of other evidence to support a finding of probable cause to search Crawford's home.").

## V.    CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds even without the challenged statements, the Affidavit is sufficient to support a finding of probable cause, such that a *Franks* hearing is not necessary. Accordingly, the undersigned

23

respectfully **RECOMMENDS**[9] that that Defendant's Motion for *Franks* Hearing [Doc. 435] be

**DENIED**.[10]

Respectfully submitted,

*Debra C. Poplin*

Debra C. Poplin
United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

[10] Due to the undersigned's recommendation, as well as the time period necessary for the parties to file objections to this Report and Recommendation, the August 24, 2020 *Franks* hearing, previously scheduled contingent on the Court's ruling on the pending motion, is **CANCELLED.**